STATE OF CONNECTICUT *v.* LARRY BROWN

SPEZIALE, C. J., PETERS, HEALEY, PARSKEY and SHEA, JS.

Argued March 4—decision released July 20, 1982

*Gerard P. Eisenman,* with whom was *Raymond W. Ganim,* special public defender, for the appellant (defendant).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Frank S. Maco,* assistant state's attorney, for the appellee (state).

SPEZIALE, C. J.   The defendant, Larry Brown, was convicted by a jury of two counts of robbery in the second degree in violation of General Statutes § 53a-135 (a) (2).   From the judgment rendered on the verdict, the defendant has appealed, claiming that the trial court erred:   (1) in admitting into evidence a written statement of an accomplice which was hearsay and prejudicial; (2) in failing to charge the jury to view with caution the testimony of an accomplice; and (3) in allowing identification testimony which was tainted by an unnecessarily suggestive show-up.   We find no reversible error.

The jury could have reasonably found the following facts:   During the evening of July 21, 1979, the defendant met Audrey DeVone near Middle Street in Bridgeport.   Thereafter, at approximately 10:30 p.m., DeVone approached and propositioned Wayne Harris, who was sitting in a parked car on Middle Street.   In the meantime, the defendant came up behind Harris and put a gun, which was actually a starter's pistol, to Harris' head.   Harris gave his wallet, which contained $6 to DeVone.   DeVone then entered the passenger side of Harris' vehicle and the defendant got in the back seat.   Harris was forced to drive to a nearby parking lot where he was ordered out of the car.   DeVone then checked him for more money.   DeVone and the defendant thereafter drove off in Harris' car.   Harris was unable to identify the defendant because he never had the opportunity to get a good look at the man involved, but testified that the defendant was of the same general build as the man who had robbed him.

Harris reported the robbery a few minutes after it occurred by flagging down a police car.

Some forty-five minutes later, at approximately 11:15 p.m., the defendant and DeVone entered a sandwich shop on North Avenue. Scott Zimmerman was working there at the time. As Zimmerman began to make sandwiches which had been ordered by the defendant and DeVone, the defendant pulled out his gun and announced: "This is a stick-up. Don't move." At the time, the defendant was standing only about four feet from Zimmerman, who later positively identified the defendant. After the defendant showed his gun, DeVone went around the counter, removed the money in the cash register, and wrapped it up in a sandwich wrapper. DeVone also checked Zimmerman's pockets. The defendant and DeVone thereafter left and Zimmerman observed the vehicle in which they fled. He then reported the robbery and the vehicle to the police.

Only a few minutes later, at approximately 11:20 p.m., Harris' vehicle, which was being driven by the defendant and in which DeVone was riding, collided with a police car at the corner of Congress and Main Streets. The police had been looking for the car since Harris' report of the first robbery. When the defendant and DeVone were taken into custody, the starter's pistol was found in the defendant's possession and the wallet and money that had been taken were recovered from the car.

## I

### ADMISSION OF WRITTEN STATEMENT

The defendant contends that the trial court erred in admitting into evidence a written statement which was given to the police by Audrey DeVone the day

after the robberies.[1]  The defendant maintains that this statement was inadmissible as hearsay and that its admission was harmful error.

During the trial, DeVone's written statement was first mentioned by the state during the direct examination of DeVone.  She was asked to identify the statement and verify her signature.  The state later attempted to use the statement to refresh DeVone's recollection on a point, but withdrew the question

[1] The statement read as follows:

"Date:  July 22, 1979 Time:  0900 Hrs.  Statement of Audrey Devine [sic] Taken by Det. T. Giblin

"Q. What is your name, age, and address.

"A. Audrey Devine [sic], 27 yrs., 601 Laurel Ave. Bpt.

"Q. How much schooling have you had.

"A. I finished the tenth grade.

"Q. Can you read and write English.

"A. Yes.

"Q. Are you making this statement of your own free will.

"A. Yes.

"Q. Have you been threatened in any way in regards to giving this statement.

"A. No.

"Q. Have any promises or promise of any reward been made to you in regards to giving this statement.

"A. No.

"Q. After reading this statement and finding it to be as you have stated, will you sign it.

"A. Yes.

"Q. Have your Constitutional safe guards been read to you and do you understand them.

"A. Yes.

"Q. Why are you here.

"A. Because I've been arrested for robbery.

"Q. When did this robbery take place.

"A. Last night.

"Q. Tell me what happened.

"A. I was out on the street hustling to get some money.  I shoot dope and thats [sic] how I was trying to get some money.  I had met this guy but I really don't remember his name.  He said that we would do some thing and get some money and get high together. I saw this old car parked on Middle St. with a guy in it.  I went over and asked the guy if he wanted to go out.  He said no, that he

when her memory apparently was not refreshed. A copy of the statement was provided to the defendant at the close of DeVone's direct testimony. DeVone testified during direct examination that she was serving concurrent sentences of two to five years after pleading guilty to robbery charges stemming from the incidents for which the defendant was on trial.

was waiting for some one. Then the guy I was with came over and hit the man in the head with a gun. He got in the back seat and kept the gun pointed at the mans [sic] head and told me to get into the front seat. Then he told the man to drive over the parking lot of Kolbe High School. When we got there he made the man get out and we took his car. The man only had six dollars.

"Q. What did you do after you took the mans [sic] car.

"A. We went to the Subway Shop to get something to eat. He was driving because I don't know how to drive. We went into the shop and ordered two sandwichs. [sic] There was a woman there and when she left he pulled out the gun and said 'This is a stick-up.' He told me to go get the money. I didn't move because I was surprised and he told me 'Move.' I went and took the money out of the register and put it into a napkin.

"Q. What happened then.

"A. We went back to the car and drove downtown. When we got downtown we saw the chief of police and he turned around and five or six other police cars came and stopped us.

"Q. Was the man that was arrested with you the same man that hit the man with the gun on Middle St.

"A. Yes.

"Q. Was he the same man that held up the Subway Shop.

"A. Yes.

"Q. What did he do with the gun.

"A. The police took it from him.

"Q. How long have you known that man.

"A. I just met him last night.

"Q. Is there anything else you want to say.

"A. I was just out there trying to get some money for the dope I needed. I never thought this would happen. I never did anything like this before and I didn't think he would do what he did. I don't have anything like this on my record.

| | Signed | Audrey Devone |
| --- | --- | --- |
| | Time | 1045 hrs. " |

During cross-examination, counsel for the defendant also had DeVone identify the statement and had it marked for identification. DeVone was then questioned at some length about the statement, during which questioning defense counsel elicited that DeVone was told by a detective that "it will make it lighter" on her if she gave a statement as to what happened, and that she was still somewhat "high" when she gave the statement. DeVone was questioned in some detail concerning her ability to recall specific events which occurred during the day of the robberies.

On redirect examination, DeVone denied any interest in trying to convict the defendant and maintained that she gave the statement to the police only because she wanted to take responsibility for what she had done. At the end of the redirect examination, the state offered the statement, to which counsel for the defendant objected on the grounds that the statement was both "hearsay and prejudicial." The state claimed the offer on the basis of its relevance to DeVone's credibility. The defendant's objection was overruled and his exception was noted. The statement was admitted into evidence without any limitation by the trial court. We agree with the defendant's claim that the statement was erroneously admitted.

"The general rule is that a witness' prior consistent statements are inadmissible at trial. *Thomas v. Ganezer*, [137 Conn. 415, 417, 78 A.2d 539 (1951)]; annot., 75 A.L.R. 2d 909, 918. Such statements clearly are barred by the hearsay rule if sought to be used to prove the truth of the matters asserted therein; see, e.g., 2 Wharton, Criminal Evidence (13th Ed.) § 500, p. 485 ('its sole purpose is to rehabilitate an impeached witness'); 4 Wigmore,

Evidence (Chadbourn Rev.) § 1132, p. 294; also, they generally are prohibited even when offered for the limited purpose of rehabilitating the witness' damaged credibility. See *United States* v. *Quinto,* 582 F.2d 224, 232 (2d Cir. 1978) and authority cited therein. The rationale upon which this rule is based is that the witness' story 'is not made more probable or more trustworthy by any number of repetitions of it. Such evidence would ordinarily be both irrelevant and cumbersome to the trial; and is rejected in all Courts.' 4 Wigmore, Evidence (3d Ed.) § 1124, pp. 194–95; *Mei* v. *Alterman Transport Lines, Inc.,* 159 Conn. 307, 315–16, 268 A.2d 639 (1970); see also 2 Wharton, Criminal Evidence (13th Ed.) § 500, p. 484 . . . ." *State* v. *Dolphin,* 178 Conn. 564, 568–69, 424 A.2d 266 (1979); see *State* v. *McCarthy,* 179 Conn. 1, 18, 425 A.2d 924 (1979); *Mei* v. *Alterman Transport Lines, Inc.,* supra; *Thomas* v. *Ganezer,* supra; *Fitzgerald* v. *Savin,* 119 Conn. 63, 69, 174 A. 177 (1934); *Palmer* v. *Hartford Dredging Co.,* 73 Conn. 182, 188, 47 A. 125 (1900); 4 Wigmore, Evidence (Chadbourn Rev.) § 1124; 29 Am. Jur. 2d, Evidence § 500; 81 Am. Jur. 2d, Witnesses §§ 641, 642.

There are certain exceptions to this general rule. Major exceptions to the general rule include using the prior consistent statement to rehabilitate a witness who has been impeached: by a prior inconsistent statement; *State* v. *McCarthy,* supra, 18–21; *Thomas* v. *Ganezer,* supra, 418; 4 Wigmore, supra, § 1126; by a suggestion of a bias or interest which was not present at the time of the prior consistent statement; *State* v. *Dolphin,* supra, 571, 572; 4 Wigmore, supra, § 1128; or by a suggestion of recent contrivance. *State* v. *Dolphin,* supra, 568 n.5; 4 Wigmore, supra, §§ 1129, 1130; see generally 4

Wigmore, supra, §§ 1125–1131; McCormick, Evidence (2d Ed.) § 49; annot., 140 A.L.R. 21; annot., 75 A.L.R.2d 909; 81 Am. Jur. 2d, Witnesses §§ 644–655.

These exceptions, however, are not applicable to this case because they only apply when the prior consistent statement is admitted solely for the purpose of rehabilitating an impeached witness.[2]  See *State* v. *Dolphin,* supra, 570; *State* v. *Mitchell,* 169 Conn. 161, 168–69, 362 A.2d 808 (1975); *Thomas* v. *Ganezer,* supra.  Here, even though the state argued that the statement was admissible because it was relevant to DeVone's credibility, the trial court did not, either at the time it admitted the statement or in its charge to the jury, caution the jury that the statement could not be considered by them to prove the truth of the matters asserted therein but could be considered only to evaluate the credibility of the

---

[2] We have expressly rejected the position taken by the Federal Rules of Evidence, rule 801 (d) (1) (B), that statements admissible under an exception to the general rule may be used beyond the limited purpose of rehabilitating an impeached witness.  *State* v. *Dolphin,* 178 Conn. 564, 570, 424 A.2d 266 (1979).

At the time the statement was offered, DeVone had been impeached by a suggestion of personal interest or bias stemming from being an accomplice and by a suggestion of faulty recollection.  The statement would not have been admissible for rehabilitation of impeachment by bias because the bias suggested was also present at the time of the statement.  See *State* v. *Dolphin,* supra; 4 Wigmore, Evidence (Chadbourn Rev.) § 1128.

The state suggests, however, that the statement may have qualified for admission to rehabilitate the impeachment by a suggestion of faulty recollection.  See McCormick, Evidence § 49, pp. 105–106 n.88; annot., 140 A.L.R. 21, 47–49; annot., 75 A.L.R.2d 909, 929–30.  Such exception, though not adopted in Connecticut, has been referred to favorably.  In *Thomas* v. *Ganezer,* 137 Conn. 415, 420–21, 78 A.2d 539 (1951), we stated that "it may well be observed that 'the accuracy of memory is supported by proof that at or near the time when the facts deposed to have transpired, and were fresh in the mind of the witness, he [or she] gave the same version

witness. Cf. *State* v. *Dolphin,* supra, 567 n.2.[3] As the general rule concerning prior consistent statements was applicable, it was error for the trial court to admit the statement over the defendant's objection.

---

of them that he [or she] testified to on the trial.' *Jones* v. *Jones,* 80 N.C. 246, 250 [1879]." Even if it were assumed that this exception was available in Connecticut, however, the statement probably would not be admissible to rehabilitate the impeachment of DeVone by faulty recollection because here DeVone's recollection was not challenged by the effects of time but rather by the effects of the alcohol and valium taken on the day of the robberies.

In any event, when a prior consistent statement is admitted to rehabilitate a witness impeached on the ground of faulty recollection, the statement is admitted for this limited purpose alone and not for any other purpose. The admission of the statement in this case was not so limited, so its admission could not be justified by this exception.

The admission of that statement in this case is also distinct from the situation where a prior statement is admitted into full evidence as past recollection recorded. See *State* v. *Rado,* 172 Conn. 74, 79, 372 A.2d 159 (1976), cert. denied, 430 U.S. 918, 97 S. Ct. 1335, 51 L. Ed. 2d 598 (1977); *Neff* v. *Neff,* 96 Conn. 273, 278–79, 114 A. 126 (1921).

[3] In its charge to the jury, the trial court in *State* v. *Dolphin,* 178 Conn. 564, 424 A.2d 266 (1979), stated, inter alia: " 'In this case, you have heard testimony from David Andrews and Edgar Gagnier who testified that they participated in this crime with the defendant, Dennis Dolphin. The defendant attempted to impeach their testimony by inferring, through cross-examination, that their testimony was not truthful and was influenced by reason of the state dropping certain criminal charges against them and allowing them to plead to a lesser offense than the ones they were originally charged with when arrested. Now, the testimony of a witness may be rehabilitated or supported by showing that he has previously made statements which are consistent with his present testimony in court. Their prior written statements taken by the police were admitted into evidence solely for your consideration in evaluating the credibility of these witnesses. Should you find that the prior statements are consistent, you may consider such statements only in connection with your evaluation of the credence to be given to that witness' present testimony in court. You must not consider the prior statement as establishing the truth of any fact contained in that statement.' " Id., 567 n.2.

Our inquiry does not end, however, with the conclusion that the admission of DeVone's statement was erroneous. We now consider whether this error was so prejudicial that it constituted harmful error. See *State* v. *Ruth,* 181 Conn. 187, 196–97, 435 A.2d 3 (1980). The erroneous admission of the statement was harmful only if the improper admission was likely to have affected the jury's verdict. *State* v. *Cooper,* 182 Conn. 207, 212, 438 A.2d 418 (1980); *State* v. *Ruth,* supra; *State* v. *McClain,* 171 Conn. 293, 300, 370 A.2d 928 (1976); *State* v. *Tropiano,* 158 Conn. 412, 427, 262 A.2d 147, cert. denied, 398 U.S. 949, 90 S. Ct. 1866, 26 L. Ed. 2d 288 (1969). Because the erroneous admission of the statement does not involve the violation of a constitutional right, it is the defendant's burden to show that the error was harmful. *State* v. *Gordon,* 185 Conn. 402, 419, 441 A.2d 119 (1981); *State* v. *Cooper,* supra; *State* v. *Ruth,* supra; *State* v. *Dolphin,* supra; *State* v. *Pepe,* 176 Conn. 75, 81, 405 A.2d 51 (1978); *State* v. *L'Heureux,* 166 Conn. 312, 323, 348 A.2d 578 (1974).

The defendant contends that the statement was so prejudicial to him that its erroneous admission could not be harmless. The defendant cites in support of this contention various items in the statement which were not before the jury through any other evidence, including assertions that DeVone was "shoot[ing] dope" and that the defendant had said that they were going to "get some money and get high together." We cannot agree, however, that the erroneous admission of the statement was itself likely to have affected the jury's verdict.

A review of the record reveals overwhelming evidence of the defendant's guilt. The defendant was positively identified by one victim and was

apprehended within a short period after the robberies with the items stolen from both victims. Also, the defendant's accomplice testified fully as to the defendant's involvement in the robberies. In view of this overwhelming evidence of guilt which was entirely separate and distinct from DeVone's statement, we conclude that the erroneous admission of the statement was harmless. See *State v. Ruth,* supra; *State v. Runkles,* 174 Conn. 405, 413–14, 389 A.2d 730 (1978); *State v. Carr,* 172 Conn. 458, 471, 374 A.2d 1107 (1977); *State v. Rado,* 172 Conn. 74, 86–88, 372 A.2d 159 (1976), cert. denied, 430 U.S. 918, 97 S. Ct. 1335, 51 L. Ed. 2d 598 (1977).

## II

### ACCOMPLICE INSTRUCTION

The defendant contends that it was error for the trial court not to instruct the jury to view with caution the testimony of Audrey DeVone because she was an accomplice. Because the defendant did not file a written request to so charge nor take an exception to the charge as given in accordance with § 854 of the Practice Book, his claim may be reviewed only if it is "plain error" which we notice "in the interests of justice." Practice Book § 3063.

It is well established that "where warranted by the evidence, it is the court's *duty* to caution the jury as to the testimony of an accomplice in its charge." (Emphasis in original.) *State v. Ferrara,* 176 Conn. 508, 511, 408 A.2d 265 (1979); see *Bruton v. United States,* 391 U.S. 123, 136, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968); *State v. Estep,* 186 Conn. 648, 652, 443 A.2d 483 (1982); *State v. Ruth,* supra, 196–97; *State v. Colton,* 174 Conn. 135, 140, 384 A.2d 343 (1977); *State v. Carey,* 76 Conn. 342, 349, 56 A.

632 (1904). "The conditions of character and interest most inconsistent with a credible witness, very frequently, but not always, attend an accomplice when he [or she] testifies. When those conditions exist, it is the duty of the judge to specially caution the jury . . . ." *State* v. *Carey,* supra. In this case, because of DeVone's status as a self-confessed accomplice in the crimes for which the defendant was being tried and her possible interest in favorable treatment, the evidence warranted the giving of the cautionary accomplice instruction. See *State* v. *Ruth,* supra.

Whether in the interest of justice we notice this failure to give the accomplice instruction as plain error depends in part on whether the failure was harmful. The failure to give the accomplice instruction would be harmful only if the absence of this instruction was likely to have affected the jury's verdict. *State* v. *Ruth,* supra. Because the failure to give the accomplice instruction does not involve the violation of a constitutional right, it is the defendant's burden to show its harmfulness. Ibid.

On the basis of our review of the record, we cannot agree that the failure to give the required accomplice instruction was likely to have affected the jury's verdict. It is relevant to the consideration of harmfulness that the jury were made aware of the possibility of DeVone's personal interest in the outcome of the case through the cross-examination of her. Even more importantly, much of DeVone's testimony was corroborated by the testimony of Harris, Zimmerman, and the arresting police officers. These factors, together with the overwhelming evidence of the defendant's guilt, as previously discussed, lead us to conclude that the trial court's failure to give the required accomplice

instruction was harmless. See *State* v. *Ruth,* supra. In view of this conclusion, it is unnecessary for us to notice the failure as plain error in this case.

## III

### IDENTIFICATION TESTIMONY

The defendant contends that the trial court erred in denying his motion to suppress the identification testimony of Zimmerman. The defendant maintains that this testimony was tainted by an unnecessarily suggestive station house show-up which gave rise to a substantial likelihood of irreparable misidentification.

During his trial testimony, Zimmerman made an in-court identification of the defendant as the man who robbed the sandwich shop. Also, Zimmerman testified as to a station house show-up on the night of the robbery at which Zimmerman also identified the defendant as the perpetrator. This show-up occurred less than an hour after the robbery. Zimmerman had been brought to the police station after the robbery and had noticed the damaged escape vehicle and police cruiser on the way. While at the station, Zimmerman was asked to look into a room to see if he could identify the perpetrator. Upon looking into the room, Zimmerman saw and identified the defendant. The defendant was handcuffed at the time and there was no attempt by the police to conceal from Zimmerman the fact that the defendant was their suspect. Zimmerman testified that there was no doubt in his mind, either in court or at the station house show-up, that the defendant was the perpetrator.

"In determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is

two-pronged: first, it must be determined whether the identification procedure was impermissibly suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the 'totality of the circumstances.' [Citations omitted.]" *State* v. *Theriault,* 182 Conn. 366, 371–72, 438 A.2d 432 (1980); see *State* v. *Ledbetter,* 185 Conn. 607, 611, 441 A.2d 595 (1981); *State* v. *Gordon,* 185 Conn. 402, 413, 441 A.2d 119 (1981); *State* v. *Packard,* 184 Conn. 258, 262, 439 A.2d 983 (1981); *State* v. *Gold,* 180 Conn. 619, 656–58, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980); *State* v. *Anderson,* 178 Conn. 287, 291, 422 A.2d 323 (1979); *State* v. *Piskorski,* 177 Conn. 677, 741, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979); *State* v. *Willin,* 177 Conn. 248, 251, 413 A.2d 829 (1979); *State* v. *Smith,* 165 Conn. 680, 684, 345 A.2d 41 (1974); see also *Manson* v. *Brathwaite,* 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *Neil* v. *Biggers,* 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).

There is no question that the station house show-up employed in this case was suggestive. " 'Without question, almost any one-to-one confrontation between a victim of crime and a person whom the police present to [the victim] as a suspect must convey the message that the police have reason to believe him [or her] guilty. . . .' *United States ex rel. Kirby* v. *Sturges,* 510 F.2d 397, 403 (7th Cir. [1975])." *State* v. *Middleton,* 170 Conn. 601, 608, 368 A.2d 66 (1976). Nor has the state made any attempt to argue that this is a case where such suggestiveness was necessary. See *Simmons* v. *United States,* 390 U.S. 377, 384–85, 88 S. Ct. 967, 19 L.

Ed. 2d 1247 (1968); *Stovall* v. *Denno*, 388 U.S. 293, 302, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967). The show-up did not occur at the scene; see *State* v. *Willin,* supra; nor does there appear to have been a need for prompt identification in order to hold the defendant because he was apprehended in the stolen vehicle and with other stolen items. See *State* v. *Gordon,* supra; *State* v. *Theriault,* supra. Furthermore, the state has made no claim that a properly conducted line-up was impractical. Thus, although the station house show-up was conducted not long after the second robbery, we conclude that it was unnecessarily suggestive. See ibid.

The determination that the show-up was unnecessarily suggestive does not end our inquiry. We next consider the second prong of our inquiry— reliability. The identification testimony is still admissible so long as, under all of the circumstances, the identification is reliable. *State* v. *Ledbetter,* supra; *State* v. *Gordon,* supra; *State* v. *Packard,* supra; *State* v. *Theriault,* supra; *State* v. *Piskorski,* supra. "The factors to be considered in determining the reliability of an identification 'include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his [or her] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.' *Manson* v. *Brathwaite,* supra, 114 (citing *Neil* v. *Biggers,* supra, 199–200)." *State* v. *Piskorski,* supra, 742.

The evidence in this case reveals that Zimmerman had the opportunity to view the perpetrator in good light from the distance of four feet during the

course of the robbery, which took only about one minute. That Zimmerman's degree of attention was high is evident from the fact that he was able to relate in detail the actions and words of the defendant and Audrey DeVone during the robbery. Although Zimmerman acknowledged a concern about the gun held by the perpetrator and expressed some concern about the prospect of being shot, there is nothing in the record which suggests that this concern in any way impaired his ability to observe. Although the record does not indicate that any description of the perpetrator was given by Zimmerman prior to the show-up, Zimmerman was certain of his identification of the defendant both at the show-up and in court. The confrontation at the station house occurred less than an hour after the robbery and Zimmerman was certain at that time that the defendant was the perpetrator. In view of the totality of the circumstances in this case, we conclude that Zimmerman's identification was reliable, and that, therefore, the trial court did not err in refusing to suppress Zimmerman's identification testimony.

There is no error.

In this opinion the other judges concurred.